**Staunton.**

BARNES V. MORRISON.

SEPTEMBER 14, 1899.

1. CONTRACT TO PURCHASE AND DIVIDE CHATTELS—*Refusal to Divide—
Action at Law.*—If two persons as individuals agree to purchase
personal property jointly and divide it between them, and the
property is purchased by one of them, who thereafter refuses to
divide with the other, the latter may sue the former at law to re-
cover damages for the breach of contract.

2. MARKET VALUE OF GOODS—*Evidence of Value—Presumption After
Verdict.*—In an action to recover the difference between the contract
price and the market value of goods, if witnesses are allowed to
testify, without objection, as to the value of the goods, it will be
presumed that they meant the market value. It is too late after
verdict to raise the objection that the market value has not been
shown.

3. EXCESSIVE VERDICT.—A verdict is not excessive which is not only
supported by evidence in the cause, but is for a less sum than that
fixed by some of the witnesses.

4. CONTRACTS—*Denial of Existence—Tender of Performance—Waiver.*—If
a party to a contract absolutely repudiates it by denying its exist-
ence, the other party is excused from making any tender of per-
formance on his part.

5. JUDICIAL AND GOVERNMENTAL SALES—*Agreements not to Bid.*—Where
property is to be sold at auction, and especially at a judicial sale
or at a sale in the course of governmental administration, a secret
combination and agreement amongst persons interested in bidding
to refrain from bidding in order to prevent competition and to
lower the selling price of the property is illegal. But it is not
necessarily corrupt for two or more persons to agree that one of
them shall purchase for their joint benefit property sold at a
judicial or other public sale. Whether such a combination is lawful

or otherwise, depends upon the intention of the parties, and the effect of the arrangement as ascertained from the evidence in each particular case.

Error to a judgment of the Hustings Court of the city of Roanoke, rendered June 9, 1898, in an action of trespass on the case, wherein the plaintiff in error was the plaintiff and the defendant in error was the defendant.

*Reversed.*

The opinion states the case.

*Hoge & Hoge*, for the plaintiff in error.

*Watts, Robertson & Robertson* and *John H. Lewis*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Upon the first trial the jury rendered a verdict for the plaintiff, which was set aside by the court on motion of the defendant. On the second trial, there was a verdict and judgment for the defendant. To that judgment this writ of error was awarded.

By section 3484 of the Code, as amended (Acts 1889-'90, p. 360; Acts 1891-'2, p. 962), it is provided that where there have been two trials in the lower court, the appellate court shall look first to the evidence and proceedings on the first trial, and if it discovers that the court erred in setting aside the verdict on that trial, it shall set aside and annul all subsequent proceedings, and enter judgment on the first verdict.

The grounds upon which the court was asked to set aside that verdict were that it was contrary to the law and the evidence, and was excessive. No objection appears to have been made, nor exception taken, to the introduction of evidence, to the instructions given, or to any rulings of the court during the progress of the trial. The only question to be considered, there-

fore, is whether the case made entitled the plaintiff to the verdict found.

The action was brought to recover damages for the breach of an alleged contract entered into between the plaintiff and defendant, by which it was agreed that the defendant should purchase for himself and the plaintiff jointly some five thousand gallons of whiskey which were being sold at public auction by a collecting officer of the United States Government to satisfy certain taxes and dues thereon. By the terms of the contract, as set out in the declaration, it was agreed that the defendant should bid off for himself and the plaintiff the entire lot of whiskey, which was to be divided equally between them, either by the barrel or the gallon; that the plaintiff should pay to the defendant one-half of the purchase price, which was to be applied to the payment of the taxes and dues for which the whiskey was sold. The declaration avers that the defendant, pursuant to the agreement, did purchase the whiskey, but afterwards refused to allow the plaintiff to have any part of it, although he (the plaintiff) then and there and afterwards offered to pay the defendant his *pro rata* share of the purchase price, and to comply in every particular with the agreement on his part.

From the facts agreed, it appears that there was due from Jamison & Prillman, manufacturers of whiskey in the city of Roanoke, the sum of $3,025 for taxes and deficiencies to the United States Government, for the payment of which one of its collecting officers advertised and sold on the distillery premises about 4,500 gallons of whiskey at $1.12 per gallon.

The plaintiff testified that he was the owner of about 500 gallons of the whiskey (sixty-three barrels); that he had purchased it from the State Savings Bank at the price of sixty cents per gallon, each agreeing in his contract of purchase to pay the taxes thereon; that, at the time the collecting officer sold the whiskey, he (the plaintiff) attended the sale to look

·after his interests; that when he arrived the sale was in progress, and the whiskey was being cried at $1.11 per gallon; that he spoke to the collector, and asked him to hold up the sale; that he was then introduced to the defendant, who had made that bid, and had a conversation with him, in which he proposed that they jointly purchase the whiskey, and that he (the plaintiff) be allowed to take the barrels shown to have been originally purchased by him; that the defendant declined the proposition, but agreed that he would buy all the whiskey for himself and the plaintiff jointly, and that " they would divide it barrel about "; that T. F. Jamison (of the firm of Jamison & Prillman) was present during the conversation, and close enough to have heard it; that the agreement between the defendant and himself was not made by either party to influence the bidding, nor to prevent competition at the sale, but only to enable the plaintiff to become the purchaser of the amount of whiskey that he had previously bought; that they were jointly interested in the purchase, but there was no agreement that they should not bid against each other.   On cross-examination, the plaintiff testified that he had gone to the sale for the purpose of protecting his interest, and that, if the defendant had refused to make the agreement with him, which they did make, he would have bid ·on the whiskey, as he had made arrangements to get money.

The plaintiff also testified that the defendant refused to deliver to him one-half of the whiskey when he demanded it on the day it should have been delivered, and introduced in evidence a letter from himself to the defendant, in which he stated that he would be ready to take his half of the liquor recently bought, as per their agreement at the warehouse, and requested the defendant to let him know the day he would be in Roanoke to divide the whiskey, and also the defendant's reply, in which he stated that he knew of no arrangement between them for the plaintiff to take one-half of the liquor bought at Roanoke at cost.

The plaintiff further testified that he believed the whiskey was worth $2.50 per gallon on the day it ought to have been delivered (November, 1896); that he had offered it to Wheeling people in 1893 and 1894 at $2 per gallon. The plaintiff then introduced as witnesses the members of the firm of Jamison & Prillman, the manufacturers of the whiskey, who were present at the day of sale. The former testified that he heard the agreement between the plaintiff and defendant, which was that the latter should buy the whiskey for himself and the plaintiff, each paying half of the purchase price, and that it was worth on the day of sale $2.50 per gallon. The other member of the firm testified that he knew the whiskey in question, and that they had been selling it prior to the sale for taxes at from $1.60 to $2.50 per gallon; that whiskey improved with age.

Another witness introduced by the plaintiff testified that he had been storekeeper of the United States at the distillery of Jamison & Prillman, where the whiskey in controversy was stored; that he had known it to sell for $2.50 per gallon, and that whiskey improved with age.

The defendant, to sustain his defence, introduced himself and two other witnesses. He testified that there was no contract between himself and the plaintiff for the purchase of the liquor; that he purchased it for himself, and had no arrangement with the plaintiff by which he was to become interested in it; that he would not take another lot of liquor at the same price, as it was not worth what he paid for it.

One of his witnesses testified that he bought of the defendant five barrels of the whiskey at $1.12 per gallon; that he thought $1.30 per gallon was a good price for it. On cross-examination, he admitted that he was then selling a part of it by retail at sixty-five cents per quart, but it was not very salable.

The other witness, who was the collecting officer, testified that he made the sale in the discharge of his official duties; that it was very common to make such sales, and nothing unusual for

persons attending them to unite and purchase jointly; that, from what he understood from the defendant that day, he was under the impression that he (the defendant) was purchasing for himself and the plaintiff jointly.

The defendant's counsel insist that the trial court may have set aside the verdict on one of several grounds, either of which was sufficient to justify its action. One of these grounds is that the plaintiff's action was based upon an agreement between partners or joint tenants, and that one partner or joint tenant cannot sue another in *assumpsit* with respect to chattels held jointly or in partnership.

The contract sued on was not an agreement between the parties as partners or joint tenants. It was a contract between them as individuals, for the purchase of property to be divided equally between them when purchased, and for its violation by either the other had the right to sue at law to recover damages for its breach. *Wright* v. *Michie*, 6 Gratt. 354; *Venning* v. *Leckie*, 13 East. 7; 3 Rob. Pr. (new) 151; 3 Minor's Inst. 700.

Another ground is that the wholesale market value of the whiskey was not shown. It is true that no witness testified in so many words what its market value was, but the plaintiff's evidence showed that the whiskey was worth, or had been selling at, from $1.60 to $2.50 per gallon. This evidence went to the jury without objection. One of the witnesses, Jamison, states positively that the whiskey was worth on the day of sale $2.50 per gallon. The presumption is that he was speaking of its market value, since it was allowed to go to the jury without objection. If the defendant had any reason to believe that he was not testifying as to its market value, the time to raise that question was when the witness testified, and not after verdict.

Another ground is that the verdict was excessive. As before stated, the plaintiff's witnesses testified that the whiskey was worth from $1.60 to $2.50 per gallon. The State Savings Bank, it appears, had some time before paid eighty cents per

gallon for a part of the whiskey, and sold it to the plaintiff at sixty cents per gallon, each agreeing to pay the tax, $1.10 per gallon in addition, making the whiskey cost, including the tax, from $1.70 to $1.90 per gallon. The verdict of the jury shows that, in arriving at the damages found, they estimated the value of the whiskey at not over $1.75 per gallon, less than it had previously sold for, and less than witnesses testified it was worth.

Another ground relied on is that the plaintiff failed to show that he had tendered performance of the contract on his part. If this were true it could avail nothing, for it is settled law that where a party to a contract absolutely repudiates it, as the defendant did in this case, by denying its existence, it excuses the other party from making any tender of performance on his part. *Lowe* v. *Harwood*, 139 Mass. 133; *Humpton* v. *Specknagle*, 9 Serg. & R. 212 (11 Am. Dec. 704).

The remaining ground relied on is that the agreement was illegal and void, because its purpose and necessary effect was to suppress bidding, or prevent fair competition when the whiskey was sold.

If such was the purpose or necessary effect of the agreement, the court properly set aside the verdict, for where property is to be sold at public auction, and especially where the sale is made by order of a court, or is made in course of governmental administration, a secret combination and agreement among persons interested in bidding, whereby they stipulate to refrain from bidding, in order to prevent competition, and to lower the selling price of the property, is illegal, according to the uniform course of decision in this country. 2 Pom. Eq. Jur., sec. 934; *Camp* v. *Bruce*, 96 Va. 521. But it is not necessarily corrupt for two or more persons to agree that one of them shall purchase for their joint benefit property sold at a judicial or other public sale. Whether such a combination is lawful or otherwise depends upon the intention of the parties and the effect of the arrangement.

This court held, in *Roudabush* v. *Miller*, 32 Gratt. 454, that, where two or more persons were desirous of acquiring different parcels of a tract of land offered for sale at auction by commissioners under a decree of court, it was not unlawful nor improper for them to bid for the whole tract, with the understanding that they would divide it, if they became purchasers, with respect to the convenience and advantage of the situation of the several parcels to their own lands respectively.

In *Phippen* v. *Stickney*, 3 Metcalf 384, it was said by the Supreme Judicial Court of Massachusetts that an agreement between A and B that A will permit B to become the purchaser of certain property, about to be offered for sale at public auction, and that A shall participate with B in the benefits of the purchase, will or will not be fraudulent, as the circumstances of the case show innocence of intention or a fraudulent purpose in making such agreement; that where such arrangement is made for the purpose, and with the view, of preventing fair competition, and by reason of want of bidders to depress the price of the articles offered for sale below the fair market value, it will be illegal, and may be avoided as between the parties, as a fraud upon the rights of the vendor; but, on the other hand, if the arrangement is entered into for no such fraudulent purpose, but for the mutual convenience of the parties, as with the view of enabling them to become purchasers, each being desirous of purchasing a part of the property offered for sale, and not an entire lot, or induced by any other reasonable and honest purpose, such an agreement will be valid and binding.

In *Wicker* v. *Hoppock*, 6 Wall. 94, the Supreme Court of the United States held that an agreement that one should procure judgment against the debtor, levy upon and sell his property, and that the other party to the agreement should bid the amount of the judgment for the property, was valid under the facts of that case. " The validity of such agreement," said Mr. Justice Swayne, in delivering the opinion of the court, " depends upon

the intention by which the parties are animated, and the object sought to be accomplished. If the object be fair—if there is no indirection—no purpose to prevent the competition of bidders, and such is not the necessary effect of the arrangement in a way contrary to public policy, the agreement is unobjectionable and will be sustained."

The Court of Appeals of New York, in *Baine* v. *Drew*, 4 Denio 287, held that one whose property is about to be sold by virtue of a chattel mortgage may lawfully agree with another that the latter shall bid a certain amount for the property, and, if he becomes the purchaser, shall give the mortgagor an undivided interest therein for the benefit of members of his family, on his paying an equal share of the purchase money.

In a later case (*Hopkins* v. *Ensign*, 122 N. Y. 144; 9 L. R. A. 731), the same court held that an agreement between two or more persons that all but one shall refrain from bidding at a judicial sale, and that he shall be permitted to purchase the property, is not necessarily void, but will be upheld if the intention of the parties is fair and honest, and the primary purpose is not to suppress competition, but to protect their own rights, and there is no purpose to defraud or injure others interested in the sale. See, also, *Kearney* v. *Taylor*, 15 How. 495; *Marie* v. *Garrison*, 83 N. Y. 14, 28; *Huntt* v. *Elliott*, 80 Ind. 245 (41 Am. Rep. 794); Greenhood on Public Policy Rule, C. L. XXVII., p. 190; Bigelow on Fraud, 142-3; 3 Am. & Eng. Ency. Law, 506-7.

The plaintiff was the owner of, or interested in, about one-half the whiskey which was offered for sale. He testified that he attended the sale to look after his interests; that the sale was in progress when he arrived; that the whiskey was being cried at $1.11 per gallon; that, at his request, the collecting officer suspended the sale for a short time, during which he was introduced to the defendant, who had made the bid of $1.11, and had a conversation with him in which he proposed that they jointly

purchase the whiskey, and that he (the plaintiff) be allowed to take the barrels shown to have been bought by him; that the defendant declined this proposition, but agreed that he would buy all the whiskey for himself and the plaintiff jointly, and that they would divide it " barrel about "; that the agreement was not made to influence the bidding by either party, nor to prevent competition at the sale, but solely for the purpose of enabling the plaintiff to become the purchaser of the amount of liquor which he had previously bought; that there was no agreement that he should not bid, and that, if he had not made the agreement he did with the defendant, he would have bid on the whiskey, as he had made arrangements to get money.

It further appears that Jamison, one of the manufacturers of the whiskey, for whose debt it was being sold, was present during the entire conversation between the plaintiff and the defendant, and knew of the arrangement between them, as did also the officer making the sale, who testified that it was nothing unusual for persons attending such sales to unite and purchase jointly.

The jury, at the request of, and in a manner satisfactory to, both parties, were instructed by the court as to the law of the case upon this question as well as upon others. The agreement was oral, and made between the parties for a purpose which was legal or illegal according to the intent with which it was entered into, or the effect which it would necessarily have upon the bidding at the sale. This was a question of fact for the jury. *Kearney* v. *Taylor, supra; Hopkins* v. *Ensign, supra; Phippen* v. *Stickney, supra*. They found in favor of its validity, and it cannot be said that their verdict was plainly against the evidence, or without evidence to support it. They had the right to believe from the evidence that the plaintiff owned about one-half of the property sold; that his sole object in attending the sale, and in making the agreement, was to protect his own interest, and to acquire the whiskey which he had theretofore purchased, or

an amount equal to it; that there was no purpose to prevent competitive bidding at the sale, and that such was not the necessary effect of the agreement.

We are of opinion, therefore, that the trial court erred in setting aside the verdict upon the first trial, and that all subsequent proceedings in the case must be set aside and annulled, and judgment entered upon that verdict.

*Reversed.*